******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# CARVAUGHN JOHNSON *v.* COMMISSIONER OF CORRECTION
## (SC 19856)

Robinson, C. J., and Palmer, McDonald, D'Auria, Kahn and Ecker, Js.

*Syllabus*

The petitioner, who had been convicted of murder and carrying a pistol without a permit, sought a writ of habeas corpus, claiming, inter alia, that his criminal trial counsel, S and B, had rendered ineffective assistance. The petitioner's first criminal trial resulted in a mistrial when the jury was unable to reach a verdict. At that trial, a witness, F, testified that he had been with the victim on the night of the murder. F also testified consistent with a statement he had made to the police that, on the night of the murder, he heard a gunshot and then saw the petitioner running from the crime scene while carrying a gun. At the petitioner's second criminal trial, after which the petitioner was convicted, F recanted his statement to the police and his testimony at the first trial, and his prior inconsistent statements from the first trial were admitted into evidence. In the habeas court, the petitioner claimed that S and B were ineffective insofar as they failed to present an alibi defense through the testimony of the petitioner's sister, J, and the petitioner's friend, A, which allegedly would have shown that the petitioner was at home with J and her children and was speaking with A on the telephone at the time of the murder. The petitioner also claimed that S and B were ineffective insofar as they failed to present a third-party culpability defense through the testimony of H, whom the petitioner claimed would have testified that he had seen F with a gun that was similar to the murder weapon a few days before the murder. The habeas court granted the habeas petition, concluding that the failure of S and B to present both defenses was deficient and that the petitioner was prejudiced by such deficient performance. The habeas court determined that it was not reasonable trial strategy for S and B not to have presented the testimony of J and A, as they had testified credibly at the habeas trial as to the petitioner's whereabouts on the night of the shooting and their testimony would have been helpful to the petitioner's alibi that he was home at the time of the shooting. The habeas court also concluded that H's testimony was relevant and admissible as third-party culpability evidence and that it was reasonably likely that the trial court would have allowed H's testimony, even if H had invoked his privilege against self-incrimination. On the granting of certification, the respondent, the Commissioner of Correction, appealed to the Appellate Court, which reversed the judgment of the habeas court insofar as the habeas court concluded that S and B had rendered ineffective assistance as a result of their failure to present an alibi defense and a third-party culpability defense, and remanded the case to the habeas court with direction to deny the habeas petition with respect to those claims. Thereafter, the petitioner, on the granting of certification, appealed to this court. *Held*:

1. The Appellate Court incorrectly determined that the petitioner failed to preserve for review his claim that S and B rendered ineffective assistance by inadequately investigating J and A as alibi witnesses on the ground that the petitioner had framed his claim as a failure to present an alibi defense rather than one of inadequate investigation, and this court's review of that claim did not prejudice the respondent: both parties and the habeas court were aware that the petitioner's claim that S and B rendered ineffective assistance by failing to present an alibi defense included the claim that they allegedly had undertaken an inadequate investigation, as the petitioner's claim was premised on the argument that, if S and B had adequately investigated his alibi defense, they would have learned that their concerns about its weaknesses were unfounded and, thus, would have presented the testimony of J and A at the petitioner's criminal trial; moreover, both parties questioned S and B extensively at the habeas trial regarding their investigation into the alibi defense, the respondent did not object to the petitioner's argument that his claim of failure to present the alibi defense was premised on the failure of S and

B to adequately investigate that defense, and there was no meaningful distinction between the failure to prepare and present, and the failure to investigate and present.

2. The Appellate Court correctly determined that it was reasonable trial strategy for S and B not to present J and A as alibi witnesses, and, accordingly, counsel did not perform deficiently: the alibi defense possibly would have been more harmful than helpful to the petitioner, as it could have distracted the jury from F's recantation, introduced issues of the petitioner's close proximity to the crime scene at the time of the murder and his consciousness of guilt, and failed to account definitively for the petitioner's whereabouts at the time of the murder; moreover, it was reasonable for S and B to be concerned that the jury might have questioned whether J was distracted by the television or by her children on the night of the murder, as her testimony did not account for the fact that the petitioner was not in her line of sight at the time of the murder, and the imprecision in the timing of the murder and the telephone calls between the petitioner and A left open the possibility that the jury might infer that the petitioner committed the murder and also participated in the telephone calls, especially in view of the close proximity of the petitioner's house to the crime scene; furthermore, the decision of S and B to cease investigating J's testimony after determining that it could be more harmful than helpful was reasonable, and new information regarding the timing of the murder that S and B learned of by the time of the second trial called into question the strength of A's alibi testimony.

3. The petitioner could not prevail on his claim that S and B provided ineffective assistance of counsel by failing to present a third-party culpability defense through H's testimony: S and B did not perform deficiently in failing to present such a defense, as H's testimony failed to establish a sufficient nexus between F and the murder because H never definitively testified that the gun he saw F possess was the same make as the murder weapon, there was no clear evidence that F possessed a gun or was at the crime scene at the time of the murder, and the record was devoid of any statements by F, the victim, or any other witness that would implicate F as the shooter, and, even if H's testimony created some direct link between F and the murder, that nexus was sufficiently weak so as to justify the strategic decision by S and B not to offer H's testimony on the ground that it would distract the jury from the weakness of the state's case and F's recantation; moreover, the petitioner did not demonstrate that H would have been unable to successfully invoke his fifth amendment privilege against self-incrimination, as other pending, unrelated charges against him involved guns, and there was a possibility that his testimony that he had attempted to steal a gun, previously possessed a gun, and recognized F's gun might have resulted in an injurious disclosure, and, because the petitioner could not establish that H's invocation of his privilege against self-incrimination would have been rejected, the petitioner could not prove that the failure of S and B to present the third-party culpability defense through H's testimony would have been prejudicial.

Argued September 12, 2018—officially released January 8, 2019

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Cobb, J.*; judgment granting the petition in part, from which the respondent, on the granting of certification, appealed to the Appellate Court, *Beach*, *Keller* and *Mullins*, *Js.*, which reversed in part the judgment of the habeas court and remanded the case with direction to deny the habeas petition in part, and the petitioner, on the granting of certification, appealed to this court. *Affirmed.*

*Damon A. R. Kirschbaum*, with whom were *Vishal K. Garg* and, on the brief, *Desmond M. Ryan*, for the appellant (petitioner).

*James A. Killen*, senior assistant state's attorney,

with whom, on the brief, were *Patrick J. Griffin*, state's attorney, and *Adrienne Russo*, deputy assistant state's attorney, for the appellee (respondent).

*Opinion*

D'AURIA, J. The petitioner, Carvaughn Johnson, appeals, upon our grant of certification, from the judgment of the Appellate Court reversing in part the judgment of the habeas court, which granted in part his petition for a writ of habeas corpus on the ground that his defense counsel had provided ineffective assistance by failing (1) to adequately prepare and present an alibi defense, and (2) to present a third-party culpability defense. The Appellate Court agreed with the respondent, the Commissioner of Correction, that it was reasonable trial strategy not to present an alibi defense, that the petitioner's claim of inadequate investigation of the alibi defense was unpreserved, and that the petitioner was not prejudiced by counsel's failure to present a third-party culpability defense. Because we hold that it was not deficient performance for defense counsel not to present the alibi defense and that it was not deficient performance or prejudicial for defense counsel not to present the third-party culpability defense, we affirm the judgment of the Appellate Court.

I

A

The jury in the underlying criminal case reasonably could have found the following facts, as set forth in this court's decision in *State* v. *Johnson*, 288 Conn. 236, 951 A.2d 1257 (2008), which affirmed the trial court's judgment of conviction on direct appeal: "The [petitioner] shot and killed the sixteen year old victim, Markeith Strong, on the evening of October 10, 2001, in New Haven. In the weeks prior to that evening, the [petitioner] and the victim had been at odds with each other. Approximately three weeks prior to the shooting, the victim's teenage sister, L'Kaya Ford [L'Kaya], was sitting with the victim at the corner of Read and Shepard Streets when she observed the [petitioner] approach. The [petitioner] walked toward [L'Kaya] and the victim, called the victim 'a punk,' and threatened to assault him. The victim said nothing, and the [petitioner] walked away.

"The victim next encountered the [petitioner] in the late afternoon of September 29, 2001, and the two engaged in a dispute over a bicycle. The victim and Ralph Ford [Ford] were around the intersection of Read and Shepard Streets, where the victim either was riding his bicycle or standing near it, when the [petitioner] stopped him, declared that the bicycle belonged to him and demanded that the victim give it to him. The victim refused and informed the [petitioner] that he had found the bicycle about one month earlier and had fixed it up. The victim told the [petitioner] that he owned the bicycle. The [petitioner] asked for the bicycle a second time, and, when the victim refused, the [petitioner] said, '[d]on't make me do something to you.' The [petitioner]

then punched the left side of the victim's head twice, which caused a small cut near the victim's left ear. During this encounter, the [petitioner] may have been carrying a gun. The [petitioner] then took the bicycle and rode away.

"After this encounter, the victim, accompanied by [Ford], returned home, where his family contacted the New Haven police to report the incident. After speaking with the victim, the police officers radioed a description of the [petitioner] and notice of a possible robbery and larceny. The police did not apprehend any suspect that day. Over the next few days, the [petitioner] approached the victim and [L'Kaya] about the police report, asserted that he was not going to jail, apologized to the victim and told him not to press charges. Toward the end of September, the [petitioner] also expressed concern to his friend, Tashana Milton Toles, about the possible criminal charges that he faced as a result of the bicycle incident and specifically remarked to her that he thought he might be going back to jail.

"On the morning of October 10, the [petitioner] approached [L'Kaya] while she was waiting for a bus. The [petitioner], who was driving a black car that [L'Kaya] described as an Acura or Ford Probe, pulled the car alongside of her and accused her of being a snitch. The [petitioner] insulted her, told her he did not like snitches and that she knew what happened to 'snitches in the hood.' That night, the victim, [L'Kaya], [Ford], and other friends gathered on the corner of Read and Shepard Streets to celebrate [L'Kaya's] birthday. Some of the group, but not [Ford] or the victim, were drinking alcohol and smoking marijuana. Around 10 p.m., the victim and [Ford] departed together. The neighborhood around Read, Shepard, Huntington and Newhall Streets affords many shortcuts through the yards of houses that are occupied by neighborhood residents. On that night, however, [Ford] did not take his usual shortcut but parted from the victim, who took the shortcut home.[1] [Ford] then continued walking alone on Read Street and proceeded around the corner to his house on Newhall Street. Upon arriving at his house, [Ford] heard a gunshot coming from the backyard of the house across the street. [Ford] then entered his front hallway. [Ford] heard someone running from the yard across the street and saw the [petitioner] run into the driveway leading to Ford's house. [Ford] saw the [petitioner] carrying a semiautomatic handgun and entering a black Acura as it exited the driveway. James Baker, who lived near the crime scene, heard someone run past his window, jump the fence outside his house and head into the backyard, toward Huntington Street. Approximately five minutes later, and around 10:20 p.m., Baker heard a single gunshot coming from behind his house. LaMont Wilson, who had left the group earlier than [Ford] and the victim, lived on Read Street and also heard a gunshot from the direction of his backyard,

sometime between 10 and 10:45 p.m. Baker called the police at approximately 10:45 p.m. to report the gunshot but did not initially identify himself because he feared retaliation from 'certain individuals' for contacting the police. Joanie Joyner, a resident of Huntington Street and the victim's next-door neighbor, also heard a loud 'boom' from the direction of her backyard and then, sometime after 11 p.m., saw something in her yard. At approximately 11:25 p.m., she also called the police.

"The [petitioner] contacted Toles by telephone between 9:45 and 10 p.m., told her that he was about five minutes away from her dormitory at Southern Connecticut State University, and asked if he could visit her. Toles agreed. The [petitioner] did not arrive at the dormitory until 11 p.m., at which time he phoned Toles from the lobby, and she came down to the lobby to register him as a visitor at the security desk. The [petitioner] was with a friend, Travis Scott. To enter the dormitory, the [petitioner] was required to provide identification at the security desk where security personnel record the information. The sign-in sheet at Toles' dormitory indicated that she signed the [petitioner] into her building at 11:10 p.m. Shortly after they signed in, a fire alarm required all residents and visitors to evacuate the building. The alarm occurred at approximately 11:30 p.m., and the fire department and university police responded to the scene. The [petitioner] and Scott waited with Toles and her roommate until the university permitted students to reenter the building. They retrieved their identification from the security desk and departed. During the investigation, Detective Daryl Breland of the New Haven [P]olice [D]epartment drove from [Ford's] house to Toles' dormitory, recorded the distance to be about three miles and noted that the trip took approximately ten minutes.

"Officers Mark Taylor and Brian Pazsak of the New Haven [P]olice D]epartment were on patrol in the Newhall and Huntington Street area on the night of October 10, 2001, and received the dispatch related to Baker's and Joyner's calls. Police responded first to Baker's call and investigated the general area, but saw nothing amiss. After responding to Joyner's call around 11:35 p.m., the officers found the victim lying face down in Joyner's backyard. The victim appeared to be unconscious and bleeding from the mouth. The officers also found a spent nine millimeter shell casing nearby. New Haven [F]ire [D]epartment personnel were called but were unable to resuscitate the victim, who was pronounced dead at the Hospital of Saint Raphael in New Haven.

"Arkady Katsnelson of the [C]hief [M]edical [E]xaminer's [O]ffice performed an autopsy of the victim on October 11, 2001, and determined that he had died of a single gunshot wound to the right side of his face. Katsnelson concluded that the bullet penetrated the

victim's face and neck, and completely severed the spinal cord, instantly incapacitating the victim. The [petitioner] was charged with the victim's murder and related crimes . . . and subsequently was tried. After seven days of deliberations, the jury in the [petitioner's] first trial was unable to reach a verdict. Therefore, the trial court, *Licari, J.*, declared a mistrial pursuant to Practice Book § 42-45." (Footnote added and footnotes omitted.) Id., 239–44.

After a second trial, the petitioner was convicted of murder in violation of General Statutes § 53a-54a (a) and carrying a pistol without a permit in violation of General Statutes § 29-35. The petitioner was sentenced to a total effective term of imprisonment of forty-three years. This court affirmed the judgment of conviction. Id., 290.

## B

Thereafter, the petitioner brought an amended petition for a writ of habeas corpus, claiming that his defense counsel, Scott Jones and Beth Merkin, had provided ineffective assistance and had an actual conflict of interest. Only the ineffective assistance of counsel claim is relevant to the present appeal. Regarding the ineffective assistance of counsel claim, the petitioner alleged that defense counsel failed (1) to present an alibi defense through the testimony of his sister, Joyce Johnson (Joyce), and his friend, Taylor Allen, and (2) to present a third-party culpability defense through the testimony of William Holly.

With respect to the alibi defense, the petitioner claimed that defense counsel had performed deficiently by failing to adequately prepare and present the testimony of Joyce and Allen. According to the petitioner, if defense counsel had properly investigated his alibi, they would have realized that he was home with Joyce and speaking on the telephone with Allen via his landline at the time of the murder. With respect to the third-party culpability defense, the petitioner claimed that defense counsel had performed deficiently by failing to present the testimony of Holly, who would have testified that a few days before the murder, he saw Ford with a gun that was similar to the murder weapon.

After a five day trial, the habeas court ruled in favor of the petitioner with respect to both ineffective assistance of counsel claims but rejected his conflict of interest claim. In its memorandum of decision, the habeas court set forth the following additional facts: "In the petitioner's first criminal trial, the court declared a mistrial due to a hung jury. The state presented testimony at the first criminal trial from an eyewitness, [Ford], who testified consistent with his statements to the police that he heard a gunshot and saw the petitioner run out of the backyard across the street carrying a black gun in his hand. At the first trial, trial counsel

presented a partial alibi defense with testimony indicating that the petitioner was at Southern Connecticut State University around 11 p.m. on the night of the murder. [The defense] did not explain the petitioner's whereabouts between 10 and 11 p.m. After the first trial resulted in a hung jury, a juror indicated that it would have been helpful for the jury to know where the petitioner was at the time of the shooting [which occurred] prior to 11 p.m.

"At the petitioner's second criminal trial, the state's key witness, Ford, recanted his prior statement and testimony that he had seen the petitioner running from the crime scene with a gun. Instead, Ford testified that the police forced him to make those statements. Ford's prior inconsistent statements at the first criminal trial were admitted for substantive purposes in the second criminal trial pursuant to [the doctrine set forth in *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986)].

"At the second trial, trial counsel's defense strategy was that the state failed to prove the petitioner's guilt beyond a reasonable doubt, that Ford was not credible, and that it was Ford [who] had accidentally shot the victim, who was Ford's friend. The petitioner's trial attorneys disagreed over whether to present an alibi, including the petitioner's whereabouts between 10 and 11 p.m. or a third-party culpability defense; Attorney Jones wanted to present both defenses and Attorney Merkin did not. Attorney Merkin prevailed, and trial counsel did not present either defense at the second trial." (Footnote omitted.)

Regarding the alibi defense, the habeas court stated: "The petitioner's trial counsel were aware of the two alibi witnesses, Allen and [Joyce], who could testify as to [the] petitioner's whereabouts between 10 and 11 p.m. on the evening of the shooting, but disagreed as to whether . . . an alibi defense should be presented. They were also aware that the jury in the first trial wanted to know where the petitioner was between 10 to 11 p.m."

The habeas court specifically found that "[Joyce] and Allen testified credibly at the habeas trial as to the petitioner's whereabouts on the night of the shooting. [Joyce] testified that the petitioner was home between 5 p.m. and 11 p.m. on the night of the shooting. During that time, [Joyce] was home with her young son and was, for the most part, in the living room in the front of the apartment watching television. From her position, she would have been able to see if the petitioner had left the house during that time. At some point, [Joyce] was aware that the petitioner and his friend were at the house and ordered a pizza. The living room had two large windows facing the driveway, and any movement outside would have activated the motion sensor lights in the driveway. If the petitioner had left

through the back door, [Joyce] would have heard him because that door screeched loudly when [it was] opened. At approximately 11 p.m., [Joyce] heard a horn honk outside, and she saw the petitioner leave the house with Allen."

The habeas court also found that "Allen, who also testified at the habeas trial credibly, called the petitioner's cell phone at 10:20 p.m., and he asked her to call his home telephone number. Allen immediately hung up and called the petitioner at home on his landline. Allen and the petitioner spoke for approximately ten to fifteen minutes on the petitioner's home phone. The petitioner then called Allen again from his home telephone around 10:40 p.m. or 10:45 p.m. Shortly thereafter, Allen drove to the petitioner's home, picked him up at approximately 10:50 p.m. or 10:55 p.m. and drove him to Southern Connecticut State University."

The habeas court also found "that trial counsel [were] aware of the statements of [Joyce] and Allen, that their testimony was credible and that production of such testimony at trial would have been helpful to the defense." Specifically, it found that "trial counsel's decision to not call the alibi witnesses was not based on the witnesses' credibility. Both Attorney Jones and Attorney Merkin found [Joyce] and Allen to be credible witnesses. Moreover, the court finds that their testimony would have been helpful to the petitioner's defense that he was home at the time of the shooting.

"Attorney Merkin decided to not present [Joyce's] testimony because she was related to the petitioner, the shooting occurred in close proximity to the petitioner's home and it was unclear whether the petitioner was in her direct vision for the entire evening. Attorney Merkin did not present Allen's testimony because she believed that Allen estimated the times of the phone calls, and the petitioner's close proximity to the crime scene would have allowed him to commit the murder despite receiving and making the phone calls at the times indicated by Allen. Trial counsel acknowledged at the habeas trial, however, that they failed to investigate [Joyce's] ability to provide an alibi at the times when the petitioner was not in her direct view.

"[Joyce] testified that the motion sensor lights and the screeching back door would have prevented the petitioner from leaving the house without [Joyce's] knowledge. Moreover, the times of the phone calls between Allen and the petitioner were seen on Allen's caller identification. That evidence, if presented, would have established that the petitioner was at home using his landline at the time the shooting occurred. Further, while Attorney Merkin was concerned that the alibi defense would place the petitioner in close proximity to the crime scene, there was already evidence before the jury that the petitioner was at Southern Connecticut State University, close to the crime scene, shortly before

11 p.m. on the night of the victim's murder. In addition, the evidence from the three alibi witnesses covered the time period between 10 and 11 p.m., making it highly unlikely that the petitioner could have committed the shooting."

The habeas court was "particularly influenced by the fact that when trial counsel decided not to submit the petitioner's alibi, they were aware that the first jury was conflicted about the petitioner's guilt, which resulted in a hung jury, and [counsel] knew that the first jury wanted to know where the petitioner was at the time the shooting occurred. While each jury is different, having this information in the petitioner's second criminal trial was a significant bonus to the defense and should have been utilized in determining whether to pursue the alibi defense."

Because the habeas court found Joyce and Allen credible and that their testimony would have been helpful to the alibi defense, the habeas court concluded that it was not reasonable trial strategy for defense counsel not to present their testimony, and, thus, defense counsel performed deficiently. Additionally, the habeas court found that the petitioner was prejudiced by defense counsel's deficient performance.

Regarding the third-party culpability defense, the habeas court stated in relevant part: "At the second criminal trial, the state established that the bullet recovered from the victim was from a Hi-Point nine millimeter pistol or semiautomatic rifle. At the habeas trial, the petitioner established that Ford showed Holly a black handgun that Ford had tucked into the waistband of his pants on the afternoon of the shooting. Holly believed that a photograph [he was shown, which had been admitted into evidence], of the Hi-Point nine millimeter pistol used in the shooting looked like the gun that he saw Ford carrying. The murder weapon and Ford's gun both had ridges above the handle, and ridges were not a common feature on the guns that Holly had seen.

"The petitioner's trial attorneys disagreed as to whether the third-party culpability defense should be presented to the jury. Attorney Jones believed that Holly's testimony should have been presented and Attorney Merkin did not, even though she admitted that Holly's testimony was consistent with the defense theory of the case, which was that Ford accidentally shot the victim.[2] The court finds the third-party culpability defense consisting of the facts that (1) Ford had been the last person seen with the victim, (2) was in close proximity to the location of the shooting at the time of the shooting, and (3) had been seen with a gun matching the description of the murder weapon on the day of the shooting, were consistent with and relevant to the defense theory that it was Ford who shot the victim by accident.

"Both Attorney Jones and Attorney Merkin thought that they would not be able to present Holly's testimony without Ford first admitting that he knew Holly. Trial counsel believed, incorrectly, that they needed, and did not have, a foundation to introduce third-party culpability evidence—that is, the testimony of Holly—once [Ford] denied knowing Holly while on the witness stand at the petitioner's criminal trial. At the habeas trial, Attorney Merkin conceded that the presentation of Holly's testimony was not contingent upon Ford admitting that he knew Holly." (Footnote added.)

The habeas court went on to state that "[t]he standard for determining whether evidence of third-party culpability is admissible is whether the presented evidence is relevant. Here, it was. Holly's testimony regarding Ford's possession of the same type of gun that was used to kill the victim on the day of the shooting, as well as other facts pointing to Ford as the shooter, would have established the necessary factual nexus for a third-party culpability claim regardless of whether Ford knew Holly. The court finds that it is reasonably likely that the trial court would have allowed Holly's testimony."

Regarding the argument that Holly might have invoked his fifth amendment privilege against self-incrimination and not testified at the petitioner's criminal trial, the habeas court found that Holly's appointed counsel at the time, Attorney Thomas Farver, "had communicated to the [trial] court on Holly's behalf that Holly would assert his fifth amendment privilege and refuse to testify if he was called [as a witness due to pending charges of robbery as well as other charges against him, and an unrelated murder investigation]. However, both Attorney Farver and Attorney Merkin testified that they were uncertain that Holly would have been permitted to invoke his fifth amendment privilege at the petitioner's criminal trial due to the fact that Holly's pending charges were unrelated to the petitioner's case. . . .

"In the present case, Holly's pending charges were unrelated to the petitioner's case, and there is no indication that Holly's testimony that he saw Ford with a gun on the day of the shooting would have exposed him to any criminal prosecution in the petitioner's or any other case. Fear of potential prosecutorial retaliation in an unrelated case does not constitute sufficient grounds to invoke the fifth amendment, as it is a mere subjective belief, not a reality, and the actual testimony would not have been incriminating in any way. Therefore, the court finds that it is not reasonably likely that Holly would have been permitted to invoke his privilege against self-incrimination in the petitioner's criminal case had trial counsel proffered him as a defense witness to support the third-party culpability defense." (Citations omitted.)

The habeas court determined that because Holly's testimony was relevant, and, thus, admissible as third-party culpability evidence, and not privileged under the fifth amendment, defense counsel were deficient for failing to present a third-party culpability defense. The habeas court further found that the petitioner was prejudiced by defense counsel's actions. Accordingly, the habeas court granted the petitioner's habeas petition with respect to the ineffective assistance of counsel claims.

C

The respondent appealed to the Appellate Court. See *Johnson* v. *Commissioner of Correction*, 166 Conn. App. 95, 140 A.3d 1087 (2016). The Appellate Court reversed the habeas court's judgment in part.[3] As to the alibi defense, the Appellate Court determined that it was a reasonable, strategic decision not to present an alibi defense, despite the witnesses' credibility, in light of defense counsel's strategy of focusing on the weaknesses in the state's case instead of muddying the waters with an alibi defense that raised "many reasonable concerns . . . ." Id., 141. Such concerns included placing the petitioner in very close proximity to the shooting at or near the time of the shooting and allowing the state to argue consciousness of guilt on the basis of the petitioner's having fled from the area of the crime to Southern Connecticut State University. Id., 137 n.16, 142.

As to the third-party culpability defense, the Appellate Court assumed without deciding that defense counsel's performance was deficient. Id., 117. However, the Appellate Court determined that the petitioner was not prejudiced by defense counsel's deficient performance because it was speculative as to whether any portion of Holly's testimony would have been admissible as third-party culpability evidence; id., 128; and because the petitioner had failed to establish that Holly would not have been entitled to invoke his fifth amendment right against self-incrimination. Id., 126. The Appellate Court determined that it was speculative as to whether the trial court would have viewed the third-party culpability evidence as having proved a direct connection between Ford and the murder. Id., 129–30. Specifically, the Appellate Court reasoned that there was no evidence that Ford was armed with the murder weapon at the scene of the crime at the time of the shooting. Id. Regarding Holly's fifth amendment privilege, the Appellate Court determined that there was insufficient evidence in the record to establish that it was perfectly clear that Holly was not entitled to invoke his fifth amendment privilege. Id., 122, 126.

Accordingly, the Appellate Court reversed the judgment of the habeas court with respect to the petitioner's ineffective assistance of counsel claims and remanded

the case to the habeas court with direction to deny the petition for a writ of habeas corpus as to those claims. Id., 142. We granted certification as to whether (1) the petitioner's claim that defense counsel performed deficiently by failing to adequately investigate the alibi witnesses was reviewable, (2) defense counsel's failure to present an alibi defense constituted deficient performance, and (3) the petitioner was prejudiced by defense counsel's failure to present a third-party culpability defense. See *Johnson* v. *Commissioner of Correction*, 324 Conn. 904, 152 A.3d 545 (2017).

II

The petitioner claims that the Appellate Court improperly rejected the habeas court's conclusion that defense counsel provided ineffective assistance of counsel. First, the petitioner claims that the Appellate Court improperly held that defense counsel's failure to present alibi witnesses was reasonable trial strategy. Second, he claims that the Appellate Court improperly held that he was not prejudiced by defense counsel's failure to present evidence of third-party culpability.

"In reviewing these claims, we are mindful that [t]he habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review." (Internal quotation marks omitted.) *Breton* v. *Commissioner of Correction*, 325 Conn. 640, 666–67, 159 A.3d 1112 (2017).

"To succeed on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy the two-pronged test articulated in *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). *Strickland* requires that a petitioner satisfy both a performance prong and a prejudice prong. To satisfy the performance prong, a claimant must demonstrate that counsel made errors so serious that counsel was not functioning as the counsel guaranteed . . . by the [s]ixth [a]mendment. . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . Although a petitioner can succeed only if he satisfies both prongs, a reviewing court can find against a petitioner on either ground." (Citations omitted; internal quotation marks omitted.) *Breton* v. *Commissioner of Correction*, supra, 325 Conn. 668–69.

Because both of the petitioner's claims involve whether defense counsel performed deficiently by failing to present the testimony of certain witnesses, we note that the deficient performance prong of *Strickland* is based on what an objectively reasonable attorney

would do under the circumstances: "[T]he defendant must show that counsel's representation fell below an objective standard of reasonableness. . . . The proper measure of attorney performance remains simply reasonableness under prevailing professional norms. . . . In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." (Citations omitted.) *Strickland* v. *Washington*, supra, 466 U.S. 688; accord *Mozell* v. *Commissioner of Correction*, 291 Conn. 62, 79–80, 967 A.2d 41 (2009); *Bryant* v. *Commissioner of Correction*, 290 Conn. 502, 512–13, 964 A.2d 1186, cert. denied sub nom. *Murphy* v. *Bryant*, 558 U.S. 938, 130 S. Ct. 259, 175 L. Ed. 2d 242 (2009).

"A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. . . . [A] reviewing court is required not simply to give [the trial attorney] the benefit of the doubt . . . but to affirmatively entertain the range of possible reasons . . . counsel may have had for proceeding as [he] did . . . ." (Citation omitted; internal quotation marks omitted.) *Michael T.* v. *Commissioner of Correction*, 319 Conn. 623, 632, 126 A.3d 558 (2015).

When faced with the question of whether counsel performed deficiently by failing to call a certain witness, the question is whether "this omission was objectively reasonable because there was a strategic reason not to offer such . . . testimony . . . [and] whether reasonable counsel could have concluded that the benefit of presenting [the witness' testimony] . . . was outweighed by any damaging effect" it might have. (Citation omitted.) Id., 633–34.

A

The petitioner's first claim is that, as the habeas court determined, defense counsel acted deficiently by failing to investigate and present alibi witnesses. Specifically, he argues that defense counsel based their decision not to call alibi witnesses on their erroneous belief that the petitioner's alibi defense was weak. The petitioner contends that if defense counsel had fully investigated the alibi witnesses' potential testimony, they would

have realized that their concerns were misplaced, especially in light of the habeas court's finding that the alibi witnesses were credible.

The respondent counters that defense counsel made a reasonable, strategic decision that was based on a myriad of concerns, regardless of the alibi witnesses' credibility. The respondent's principal contention is that the Appellate Court properly concluded that it was a reasonable tactical decision not to distract the jury from Ford's recantation by muddying the waters with an alibi defense that was not airtight and was possibly more harmful than helpful. We agree with the respondent and the Appellate Court.

1

As an initial matter, we must address the reviewability of the inadequate investigation portion of the petitioner's claim. The Appellate Court held that the petitioner's claim of inadequate investigation of the alibi witnesses was not properly preserved because he framed his claim as a failure to " 'present' " alibi witnesses, not as a failure to investigate. *Johnson* v. *Commissioner of Correction*, supra, 166 Conn. App. 132 n.14. We disagree with the Appellate Court.

The Appellate Court is correct that we review only claims that were distinctly raised before the habeas court. See, e.g., *Eubanks* v. *Commissioner of Correction*, 329 Conn. 584, 597–98, 188 A.3d 702 (2018). We conclude that the petitioner did distinctly raise before the habeas court his claim that defense counsel failed to "properly prepare and present" his alibi defense. Although, in his amended petition for a writ of habeas corpus, the petitioner phrased his claim as a failure to "present" the testimony of Joyce and Allen, it is sufficiently clear from the record that, throughout the habeas proceedings, the petitioner proceeded on a general theory that if defense counsel had adequately investigated his alibi defense, they would have learned that their concerns about its weaknesses were unfounded and, thus, would have presented the alibi witnesses' testimony at trial. See *Broadnax* v. *New Haven*, 270 Conn. 133, 173–74, 851 A.2d 1113 (2004) ("[t]he complaint must be read in its entirety in such a way as to give effect to the pleading with reference to the general theory upon which it proceeded, and do substantial justice between the parties" [internal quotation marks omitted]).

Both parties questioned defense counsel extensively at the habeas trial regarding their investigation into the alibi defense. The respondent never objected to the petitioner's argument that his claim of failure to present the alibi defense was premised on defense counsel's failure to adequately investigate the defense. The petitioner's posttrial brief framed his claim as a failure "to properly prepare and present [his] alibi defense . . . ."

He specifically argued in his posttrial brief that defense counsel's failure to sufficiently investigate his alibi defense led to their failure to present alibi witnesses. In response, the respondent in [his] posttrial brief argued that defense counsel's actions constituted reasonable trial strategy, notwithstanding the failure to investigate Joyce more thoroughly.

We see no meaningful distinction between the phrases "failure to prepare and present" and "failure to investigate and present" that renders the investigation portion of this claim unpreserved. "Preparation" necessarily includes "investigation." See *Skakel* v. *Commissioner of Correction*, 329 Conn. 1, 34, 188 A.3d 1 (2018) ("[p]retrial investigation, principally because it provides a basis [on] which most of the defense case must rest, is, perhaps, the most critical stage of a lawyer's preparation" [internal quotation marks omitted]); *State* v. *Komisarjevsky*, 302 Conn. 162, 177–78, 25 A.3d 613 (2011) ("[t]he right to prepare a defense for its presentation at trial is an integral part of a fair trial, and includes investigation of material facts and access to potential witnesses").

Moreover, we note that underlying a claim of failure to present a witness are the issues of whether defense counsel conducted a reasonable investigation and had an adequate explanation for deciding not to call that witness. See *State* v. *Talton*, 197 Conn. 280, 297, 497 A.2d 35 (1985) (defense counsel will be deemed ineffective only if they know about a witness, and "without a reasonable investigation and without adequate explanation, failed to call the witness at trial"). In the present case, the record establishes that the petitioner's claim of inadequate presentation was inextricably linked to his related claim of inadequate preparation. In other words, the petitioner's claim was premised on the argument that, if defense counsel had adequately investigated his alibi defense, they would have learned that their concerns regarding its weaknesses were unfounded and, thus, would have presented the alibi witnesses' testimony at trial.

Finally, as reflected in its memorandum of decision, the habeas court understood the petitioner's claim as a "[f]ailure to prepare and present [an] alibi defense." In reciting the relevant law on this issue, the habeas court specifically stated that "[d]efense counsel will be deemed ineffective only when it is shown that a defendant has informed his attorney of the existence of the witness and that the attorney, without a reasonable investigation and without adequate explanation, failed to call the witness at trial." (Internal quotation marks omitted.) The habeas court found that defense counsel had "failed to investigate [Joyce's] ability to provide an alibi at the times when the petitioner was not in her direct view."

It is clear to us that the habeas court considered

defense counsel's investigation of Joyce in reaching its determination that her testimony would have provided an alibi and should have been presented to the jury. Thus, all parties and the habeas court were aware that the petitioner's claim of failure to present the alibi defense included his claim that defense counsel had allegedly undertaken an inadequate investigation. Therefore, our review of this claim would not prejudice the respondent. We find that the petitioner adequately preserved his claim that defense counsel performed deficiently by failing to adequately prepare and present his alibi defense.

2

The following additional facts are necessary to our determination of this claim. At the habeas trial, Joyce testified that the petitioner was home with her from approximately 5 to 11 p.m. on the night of the shooting. She further testified that the petitioner had a female guest named Camia at the house from between approximately 6 to 8 p.m. and that he stayed home after she left. Joyce testified that during the critical time between 10 and 11 p.m., when the murder occurred, the petitioner was home, "walking around the house" "back and forth [in between] rooms [and] talking on the phone," but that he was "mainly in his room." During this time, she was in the living room playing with her children and watching television. She admitted, however, that the petitioner was not consistently within her line of sight. She testified that the petitioner left the house at about 11 p.m. and that he did not leave the house at any other time between 5 and 10:45 p.m. because either she would have seen him leave through the front door, or, if he had left through the back door, she would have seen the sensor light located in the driveway go on or would have heard the back door screech. Joyce testified that she never gave a sworn statement to the police but did convey all of this information to defense counsel's investigator, Matthew Whalen, prior to the second trial.

Joyce's testimony was not offered at the criminal trial because defense counsel elected not to present an alibi defense. Attorney Jones testified that he and Attorney Merkin disagreed about this decision. Attorney Jones testified that he wanted to present the alibi defense but Attorney Merkin did not.[4] In the end, defense counsel testified that after hearing Ford recant during the state's case-in-chief, Attorney Jones yielded to Attorney Merkin's decision not to present the alibi defense on the ground that it was cleaner to have "the jury just focused on whether or not the state met its burden of proof through Ralph Ford," in light of the fact that he was the sole eyewitness and had recanted on the witness stand at the second trial. Defense counsel were concerned that the alibi defense would "[pull] attention away from [the recantation and] the weaknesses in the

state's case and . . . [place the] jurors' focus on the weaknesses in the alibi."

Attorney Merkin testified that Joyce's testimony was weak on the basis of various concerns she had: "[O]ne, that she's a family member; two, that this [the alibi] happened a block away from the shooting; number three, that he was getting a ride and leaving the area at 10:45 [p.m., creating possible consciousness of guilt evidence on the basis of flight]. I didn't like that because the jurors could infer that he had maybe done the shooting and was taking off. Plus, I thought that we had done a very good job in [the] second trial of attacking Ralph Ford."[5] An additional concern, according to Attorney Merkin, was that Joyce did not come forward and give a statement to the police.[6] Attorney Merkin also testified that when the defense team initially spoke with Joyce, she was not as clear and certain about the times when the petitioner was home,[7] or about whether the petitioner was within her range of vision or in the house the entire night until 10:45 p.m. Attorney Merkin related that she was concerned that, on cross-examination, the prosecutor could get Joyce to admit that her attention had wandered to the television or that she had gone into another room for a few minutes, allowing for the inference that the petitioner could have left without her knowledge.

Although Attorney Jones admitted that he was "pretty confident" that he and Attorney Merkin never asked Joyce *how* she knew the petitioner was in the house even when she did not see him, he nevertheless testified that if they had known about the sensor light and screeching door, "it wouldn't have necessarily made or broke the decision in this regard to present the alibi defense." He testified that there remained the concern that Joyce "could not unequivocally tell you that she was in the presence of [the petitioner] between 10:20 and even 10:45 p.m. . . . Not continuously . . . ." Additionally, although the jury knew that the petitioner's home was close to the crime scene, in the absence of the alibi testimony, there was no evidence in the record to suggest that the petitioner was home at the time of the murder,[8] and such evidence could have had the harmful effect of placing him in very close proximity to the crime scene at the time of the shooting.

As to Allen, she testified at the habeas trial that she had called the petitioner on his cellular phone between 10 and 10:20 p.m. on the night of the shooting. According to her, the petitioner answered her call and told her to call him back on his home phone. She testified that she called him back on his landline and that they spoke for approximately ten to fifteen minutes. Allen testified that they spoke about the petitioner lending her money to buy supplies for her baby. She further testified that he then called her from his landline at 10:35 p.m. and that they spoke for approximately five minutes. Her caller

identification system recorded that the petitioner called her from his landline at 10:35 p.m., but it did not record the timing of the prior calls. Allen then picked the petitioner up with her vehicle at his home at approximately 10:50 p.m. and drove him to Southern Connecticut State University. Allen testified that she related this information to Investigator Whalen.

Investigator Whalen testified at the habeas trial that although Allen told the police that she first had called the petitioner on his landline at approximately 10:20 p.m. on the night of the shooting, she told him that she initially called him on his cell phone and then called him back on his landline between 10 and 10:15 p.m. Moreover, Investigator Whalen testified that because the shooting occurred sometime between 10:20 and 10:30 p.m. and because Allen was uncertain as to the timing of the first two phone calls, there was "no definitive information from her that a phone call was taking place during the time that . . . the shots were fired . . . ."[9]

Attorney Jones testified that although he wanted to present the alibi defense, he was concerned that Allen's testimony would place the petitioner in close proximity to the shooting and that "the jury could find it plausible that he could slip out [of his home to commit the murder] in a relatively short time period." Attorney Merkin testified that, in addition to her general concerns about alibi defenses; see footnote 4 of this opinion; she was concerned that Allen was not certain enough about the timing and length of the first two phone calls. Allen's testimony regarding the length of the first call to the petitioner's landline was uncertain, fluctuating anywhere between five minutes, ten minutes, and twenty minutes. Attorney Merkin believed Allen to be "vulnerable to cross-examination. . . . How do you know how long you were talking, you know; are you sure it was 10:00? Was it 10:00? Was it 10:20? You say 10:00 or 10:20—you know, things like that that were shifting variables in her testimony, that concerned me." Like Attorney Jones, Attorney Merkin also testified that she was concerned about placing the petitioner in close proximity to the crime scene and informing the jury that, soon after the shooting, the petitioner fled from the area. Attorney Merkin testified that she did not want the issues of timing, proximity, and flight to distract the jury's attention "away from the questions about [Ford's] credibility."

In determining whether defense counsel failed to properly prepare and present Joyce's and Allen's alibi testimony, the following additional legal principles guide our analysis. Defense counsel will be deemed ineffective only if they knew of the existence of a witness and, "without a reasonable investigation and without adequate explanation, failed to call the witness at trial. The reasonableness of an investigation must be

evaluated not through hindsight but from the perspective of the attorney when he was conducting it." *State* v. *Talton*, supra, 197 Conn. 297–98.

"[O]ur habeas corpus jurisprudence reveals several scenarios in which courts will not second-guess defense counsel's decision not to investigate or call certain witnesses or to investigate potential defenses, [including] . . . when . . . counsel learns of the substance of the witness' testimony and determines that calling that witness is unnecessary or potentially harmful to the case . . . ." *Gaines* v. *Commissioner of Correction*, 306 Conn. 664, 681–82, 51 A.3d 948 (2012); see *Morquecho* v. *Commissioner of Correction*, 164 Conn. App. 676, 685, 138 A.3d 424 (2016) ("we note that the petitioner's first criminal trial resulted in a hung jury, lending credence to [defense counsel's] decision not to present 'weak witnesses' who could tarnish the petitioner's defense during his second criminal trial").

Moreover, "we acknowledge that counsel need not track down each and every lead or personally investigate every evidentiary possibility before choosing a defense and developing it." (Internal quotation marks omitted.) *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 683. "[T]he failure of defense counsel to call a potential defense witness does not constitute ineffective assistance unless there is some showing that the testimony would have been helpful in establishing the asserted defense." Id., 681. When the failure to call a witness implicates an alibi defense, an alibi witness' testimony has been found unhelpful and defense counsel's actions have been found reasonable when "the proffered witnesses would fail to account sufficiently for a defendant's location during the time or period in question . . . ." *Spearman* v. *Commissioner of Correction*, 164 Conn. App. 530, 546, 138 A.3d 378, cert. denied, 321 Conn. 923, 138 A.3d 284 (2016); see also *Morquecho* v. *Commissioner of Correction*, supra, 164 Conn. App. 685 (decision not to call alibi witnesses was reasonable when "no witness could establish that the petitioner was at home during the critical time frame").

For example, in *Spearman* v. *Commissioner of Correction*, supra, 164 Conn. App. 533, the petitioner alleged that his defense counsel had performed deficiently by failing to present alibi witnesses at his criminal trial. The petitioner in *Spearman* had been charged with and convicted of arson for setting fire to a house located across the street from the house in which he was staying. Id., 534–35, 546. Alibi witnesses told defense counsel that the petitioner had been asleep in his room at the time the fire was set and started. Id., 548, 550–52. All of the alibi witnesses were believed to be credible by defense counsel. Id., 546. However, defense counsel was concerned that the alibi witnesses were vulnerable on cross-examination because they were all family members, they could not provide an airtight alibi, and

they would place the petitioner in close proximity to the crime scene. Defense counsel in *Spearman* found the alibi to be weak because although the witnesses credibly stated that they believed the petitioner to be in his room asleep, the petitioner had not been in their line of sight during the relevant time period. Id., 548. As a result, defense counsel decided not to offer an alibi defense at trial.

Both the habeas court and the Appellate Court in *Spearman* held defense counsel's decision to be reasonable trial strategy.[10] Id., 552, 561. Specifically, both courts determined that defense counsel "reasonably was concerned about offering the alibi testimony because none of these witnesses [was] able to provide an alibi for the petitioner before the fire, and it was not disputed that the petitioner's house was in close proximity to, and easily accessible by the petitioner from, the site of the arson. In particular, [defense counsel] testified that cross-examination might potentially have exposed the possibility that the petitioner [c]ould . . . have woken up and went out the back door and returned . . . . None of the proffered alibi testimony, even if believed, established that the petitioner was in bed . . . either sufficiently prior to, or at the precise moment, when the fire was started." (Internal quotation marks omitted.) Id., 562. The Appellate Court in *Spearman* found defense counsel's decision reasonable even though the state's case was relatively weak and rested primarily on the testimony of one eyewitness of questionable credibility.

In the present case, defense counsel testified to a variety of strategic reasons for their decision not to present an alibi defense. We are required to "indulge [the] strong presumption that counsel made all significant decisions in the exercise of reasonable professional judgment." (Internal quotation marks omitted.) *Cullen* v. *Pinholster*, 563 U.S. 170, 196, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011). In fact, we are "required not simply to give [the] attorneys the benefit of the doubt . . . but to affirmatively entertain the range of possible reasons . . . counsel may have had for proceeding as they did . . . ." (Citations omitted; internal quotation marks omitted.) Id.

In general, defense counsel were concerned that the alibi defense would distract the jury from Ford's recantation.[11] Defense counsel decided to focus the jury's attention on the fact that the state had a weak case and that the only eyewitness had recanted on the witness stand, especially in light of the fact that the first trial ended in a hung jury. Defense counsel wanted the last thing that the jury heard before it began deliberations to be the state's lack of evidence, and not a possibly problematic alibi defense. Specifically, as to both Joyce and Allen, defense counsel were concerned that the alibi defense would place the petitioner in close proxim-

ity to the crime scene and allow the prosecutor to argue consciousness of guilt on the basis of flight because both witnesses testified that the petitioner left the area at approximately 10:50 p.m. As to Joyce in particular, defense counsel believed that she would be vulnerable on cross-examination based on her bias as a family member, the petitioner's having been outside of her line of sight when they were in the house together, her having been potentially too distracted by her children and the television to notice the petitioner leaving the house, her failure to give a sworn statement to the police, and the petitioner's failure to identify her to the police as an alibi witness. As to Allen, defense counsel had concerns that the imprecise timing of the telephone calls between her and the petitioner, and the shooting, would allow the jury to infer that the petitioner had time to both commit the murder and speak with Allen on the telephone.

The reasons stated by defense counsel are similar to those found reasonable in *Spearman*. In both cases, the alibi witnesses were family, the alibi placed the petitioner in close proximity to the crime scene, and the alibi witnesses testified that the petitioner was home but not within their line of sight. In the present case, although Joyce testified that she would have known if the petitioner left the house because of the screeching back door and sensor lights in the driveway, her testimony did not account for the fact that the petitioner was not within her line of sight during the time of the murder. It was reasonable for defense counsel to be concerned that the jury might have questioned whether she was distracted by the television or her children that night.[12] Such a concern was justified even if she was considered a credible witness by the habeas court or defense counsel.

Additionally, although the jury reasonably could have concluded that Allen's testimony established that the petitioner was speaking with her from his landline at the time of the murder, the imprecision in the timing of the calls and the timing of the murder also made it possible that the jury could have concluded that he participated in the calls *and* committed the murder, especially given the close proximity of his house to the crime scene. Once again, despite the habeas court's finding that Allen's testimony was credible,[13] it was reasonable for defense counsel to be concerned that the jury might determine that the imprecision in timing left open the possibility that the petitioner committed the murder *and* participated in the telephone calls.

It is important to accord due weight to defense counsel's concern that the alibi testimony would have placed the petitioner a mere two blocks from the crime scene at or near the time of shooting. The petitioner argues that the alibi defense would not have been risky because the jury already knew where the petitioner's house was

located and that at approximately 11 p.m. he was a few miles away from the crime scene at Southern Connecticut State University. But the alibi evidence, if presented, would have established that at the time of the shooting, the petitioner was at or near his home in very close proximity to the shooting. No other evidence so directly highlighted the petitioner's proximity to the scene of the crime at the time of the shooting. There is a distinction between being a few miles away from the crime scene soon after the murder, and being within two blocks of the crime scene at or near the time of the murder and then fleeing from the scene shortly thereafter.

As a result, we conclude, as the Appellate Court did in *Spearman*, that counsel made a reasonable strategic decision because "the proffered witnesses would [have] fail[ed] to account sufficiently for [the petitioner's] location during the time or period in question . . . ." *Spearman* v. *Commissioner of Correction*, supra, 164 Conn. App. 546. Even if "there [was] some showing that the [alibi] testimony would have been helpful in establishing the asserted [alibi] defense"; (internal quotation marks omitted) *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 681; defense counsel made a strategic decision that presenting an alibi defense had the potential to be more harmful than helpful to the petitioner's case. See id., 681–82; see also *Morquecho* v. *Commissioner of Correction*, supra, 164 Conn. App. 681–85 (defense counsel's decision not to present alibi was reasonable strategy when alibi did not definitely place petitioner home at time of murder and would possibly distract jury from state's weak case). Although the state's case against the petitioner might not have been overwhelming and another attorney might have defended him differently,[14] we cannot conclude that his conviction was a result of constitutionally deficient counsel under *Strickland*.

Nevertheless, the petitioner argues that proper investigation into the testimony of Joyce and Allen would have enabled defense counsel to address any weaknesses in the alibi defense. As to Joyce, he argues that defense counsel's concern about his having been outside of Joyce's line of sight when he was in the house with her would have been ameliorated if defense counsel had learned that Joyce would have known if he had left the house because she would have heard the screeching back door or seen the outdoor sensor lights. At the habeas trial, defense counsel admitted to not having asked or known about the screeching back door or the sensor lights. But Attorney Jones also testified that such knowledge would not have affected the decision not to present the alibi defense. Screeching door or not, defense counsel still had concerns regarding (1) the petitioner's having been outside of Joyce's line of sight, (2) Joyce's having potentially been too distracted by her children and the television to notice the petitioner leaving the house, even with the screeching door

and sensor lights, (3) proximity to the crime scene, (4) consciousness of guilt on the basis of flight, and (5) bias. Defense counsel ceased investigating only after they decided that calling Joyce potentially would be more harmful than helpful to the case. See *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 681–82. Such a decision is reasonable, and we will not second-guess it with the advantage of hindsight.

As to Allen, the petitioner alleges that defense counsel would have presented her testimony if they had properly investigated the timing of the telephone calls between her and the petitioner. He contends that defense counsel were mistaken regarding the timing of the calls and the shooting. If defense counsel had been fully aware of Allen's testimony, the petitioner reasons, they would have realized that her testimony made it impossible for him to have time to participate in the telephone calls with Allen and to leave the house to commit the murder.

It is true that at the first criminal trial, defense counsel mistakenly believed that the shooting occurred at approximately 10:45 p.m. At oral argument before this court, the petitioner contended that during the second criminal trial, defense counsel continued to labor under the misapprehension that the shooting occurred at 10:45 p.m. His contention was based on defense counsel's notice of alibi, which stated that the shooting occurred at 10:45 p.m. The notice of alibi, however, was from the first criminal trial. Defense counsel testified at the habeas trial that by the time of the *second* trial, they *were* aware that the shooting occurred between 10:20 and 10:30 p.m., and that Allen had indicated that she had spoken with the petitioner on the telephone via his landline sometime between 10 and 10:20 p.m. for an uncertain length of time and again at 10:35 p.m. Defense counsel knew of and considered this information when they decided not to present Allen's testimony at the second criminal trial. As a result, the petitioner has not identified any information that defense counsel failed to glean from their investigation of Allen.[15]

Additionally, the petitioner argues that defense counsel's decision to forgo an alibi defense was not reasonable because a juror from the first criminal trial specifically told defense counsel that it would have been helpful if the jury knew where the petitioner was between 10 and 11 p.m. on the night of the shooting. According to the petitioner, his "whereabouts at the time of the shooting was the most significant factor in the jury's failure to acquit."[16] This reasoning is flawed on two accounts. First, although the first jury may have wanted to know where the petitioner was at the relevant time, the answer provided by the alibi evidence was decidedly double-edged because it placed the petitioner extremely close to the scene of the crime. Second, the second trial occurred under circumstances that were

markedly different from those of the first trial because of Ford's recantation. It was reasonable for defense counsel to change their strategy accordingly. Defense counsel made the strategic decision that, despite the first jury's having wanted to know the petitioner's whereabouts, the alibi evidence had the potential to do more harm than good at the second trial and should be sidelined in favor of a less risky strategy that was based on Ford's recantation.

For all of the foregoing reasons, we agree with the Appellate Court that defense counsel made a reasonable strategic decision not to present an alibi defense that possibly would have been more harmful than helpful by distracting the jury from Ford's recantation, introducing issues of proximity and consciousness of guilt, and failing to account definitively for the petitioner's whereabouts during the time of the shooting. Because defense counsel's performance was not deficient, we conclude that the petitioner failed to satisfy his burden under the first prong of *Strickland*.

B

The petitioner next claims that the Appellate Court improperly concluded that he was not prejudiced by defense counsel's failure to present third-party culpability evidence. Specifically, he argues that the Appellate Court improperly determined that (1) Holly's testimony was inadmissible as third-party culpability evidence, and (2) he had failed to establish that Holly would not have been allowed to invoke his fifth amendment privilege against self-incrimination.[17] As to whether there was sufficient evidence to establish third-party culpability, the petitioner argues that there was substantial evidence connecting Ford to the shooting because he was the last person to see the victim alive and had possessed a gun similar to the murder weapon.[18] As to Holly's fifth amendment privilege, the petitioner argues that Holly would have provided no valid basis at the criminal trial for invoking this privilege.

The respondent contends that the Appellate Court properly determined that Holly's testimony was inadmissible and that there was insufficient evidence to determine whether Holly would have been able to successfully invoke his fifth amendment privilege. We agree with the reasoning of the Appellate Court, although we believe that the admissibility of Holly's testimony is more appropriately considered under the deficient performance prong of *Strickland*, whereas the issue of his fifth amendment privilege should be reviewed under the prejudice prong. Accordingly, we affirm the decision of the Appellate Court, albeit on slightly different grounds.

The following additional facts are necessary to our determination of this claim. At the underlying criminal trial, the state offered the testimony of James Stephen-

son, a firearms and tool mark examiner with the state's forensic science laboratory. Stephenson testified that a nine millimeter cartridge casing was found at the scene of the crime and that a nine millimeter jacketed bullet was retrieved from the victim's gunshot wound. He testified that there was no scientific way to prove that the bullet was part of the cartridge casing that had been found at the scene of the crime. Additionally, the murder weapon had never been recovered. However, on the basis of the markings on the bullet, he testified that the bullet had been fired from a gun manufactured by Hi-Point and that the gun was either a semiautomatic pistol or a rifle.

At the habeas trial, the petitioner offered the testimony of Gerard Petillo, a firearms expert, who confirmed Stephenson's testimony that Hi-Point guns create distinctive ballistics evidence. Petillo further testified regarding unique physical characteristics of Hi-Point guns, such as the Hi-Point logo and firearm information stamped onto the left side of the gun. Neither expert testified about whether the ridging design near the handle of a Hi-Point semiautomatic pistol was unique to pistols manufactured by Hi-Point.

At the habeas trial, Holly testified that he saw the victim and Ford on the afternoon of the shooting coming down Newhall Street on bicycles when they stopped and Ford showed Holly a handgun that he had tucked into the waistband of his pants. Holly testified that he tried to grab the gun because he wanted it but that Ford ran away.

Holly testified that he saw only the handle of the gun, not the barrel. He described the gun as either a nine millimeter or .380 caliber black pistol. He testified further that he was not sure if the gun was real or fake and thought it could have been a BB gun. However, Holly did testify that it "looked like one of the guns [he] had before" and that he knew guns. When shown the photograph of a black, Hi-Point nine millimeter semiautomatic pistol, Holly testified that "[t]hat might be it. It looked like the gun" that he saw in Ford's possession because of the ridges at the top near the handle but that he had seen other kinds of guns with ridges in the past. He further testified that he had provided all of this information to Investigator Whalen.

Despite having provided this information at the habeas trial, Holly also testified that he had told both his own attorneys and Investigator Whalen that he was not willing to testify at the criminal trial. He testified that he had been advised by counsel to invoke his fifth amendment privilege against self-incrimination. Nevertheless, he testified that if he had been ordered to testify by the criminal court, he would have testified. He testified that he did not recall telling Attorney Farver that he would not testify at the criminal trial even if the trial court rejected his claim of a fifth amendment privilege.

Holly testified that his reason for not wanting to testify was that he was worried that the prosecutor handling a criminal case then pending against him also was the prosecutor for the petitioner's case and would hold any testimony favorable to the petitioner against him.

Holly testified that although he wanted to invoke his fifth amendment privilege, he had not been worried at the time of the criminal trial that he possibly would incriminate himself if he had been required to take the witness stand. This claim does not withstand scrutiny. Holly had multiple criminal cases pending against him at the time of the petitioner's criminal trial. Specifically, Farver testified at the habeas trial that Holly was under investigation in a murder case and had been "busted with the gun" involved in that case. Additionally, Attorney Thomas Ullman, a public defender who represented Holly in connection with other criminal matters, testified at the habeas trial that he represented Holly at the time of the petitioner's criminal trial in relation to charges of robbery in the first degree and assault on a police officer. Attorney Ullman also testified that he had represented Holly in some other matters as well at that time but that they did not result in a plea or sentence. On the basis of these other pending criminal matters, Attorney Ullman stated, he advised Holly not to speak with Investigator Whalen or to testify at the petitioner's criminal trial "[b]ecause [there was] the potential that . . . Holly could incriminate himself or hurt his situation in the pending case" in which Attorney Ullman was representing him.

Attorney Farver testified that Holly had informed him that he intended to invoke his fifth amendment privilege, but he did not recall Holly's reasoning for wanting to do so and believed that even if he did recall Holly's reasoning, such information would be privileged. He further testified that he had told the criminal court at the hearing on a motion for a new trial that Holly would be exercising his fifth amendment right because he had pending charges and did not want to testify. He also had told the court that although he was not certain whether Holly could successfully invoke this privilege, Holly had told him that he would not testify even if ordered to do so by the court.

At the habeas trial, defense counsel's description of Holly's hypothetical, third-party culpability testimony differed from Holly's testimony at the habeas trial. Both Attorney Jones and Attorney Merkin testified that Holly had informed them that he had seen Ford with a gun two or three days before the victim was shot. Specifically, defense counsel testified that Holly had informed them that two or three days before the murder, he had seen Ford, the victim, and another person named Cory Hunter on the corner of Newhall and Huntington Streets, and that Ford had "[e]ither a nine millimeter or a .380 caliber, black semiautomatic" gun. Although

Holly was not sure if the gun was real or fake and did not know the manufacturer, he told defense counsel that he had wanted the gun and tried to grab it. Additionally, Attorney Jones testified that Holly did not witness Ford shoot the victim and that the murder weapon was never recovered.

On the basis of this information, defense counsel testified that, at the time of the criminal trial, (1) they did not believe that there was sufficient evidence to support a third-party culpability defense, and, (2) as with the alibi testimony, they did not want to distract from the weakness of the state's case and Ford's recantation.[19] Defense counsel were concerned that there was not a sufficient nexus to establish third-party culpability because Holly's testimony did not directly connect Ford to the murder in any way: Holly's testimony was about seeing a gun two or three days prior to the murder, not on the day of the murder; there were no statements by Ford about using the gun; Holly could not provide specific information regarding the gun, such as its manufacturer, make, or model; and no one witnessed Ford using the gun. However, Attorney Merkin admitted at the habeas trial that defense counsel did not show Holly a photograph of a nine millimeter Hi-Point pistol to see if he could identify it as the kind of gun he saw in Ford's waistband.

Attorney Jones also testified that he was aware that Holly would exercise his fifth amendment right not to testify, "[t]o the extent that he could," if called to testify. He recalled that Holly had been advised not to cooperate and to invoke his fifth amendment privilege. Nevertheless, Attorney Jones testified that this knowledge did not factor into the decision not to call Holly at the criminal trial.

Attorney Merkin also testified that Holly's intention to invoke his fifth amendment privilege against self-incrimination was not part of her decision not to call him as a witness. She was aware, however, of his intention to invoke the privilege and thought about his intent to do so prior to making the decision not to call him. Attorney Merkin further testified that although Holly never was implicated in the present case, his testimony regarding his attempt to grab the gun from Ford may have been self-incriminating.

1

With this factual backdrop in mind, "the question of whether [counsel's] actions fell below an objective standard of reasonableness turns on whether [the] decision not to solicit the testimony of . . . [a witness] to support the [third–party] culpability defense can be considered sound trial strategy, or whether it constitutes a serious deviation from the actions of an attorney of ordinary training and skill in criminal law." *Bryant* v. *Commissioner of Correction*, supra, 290 Conn. 513.

To determine whether an objectively reasonable attorney would decide not to present a third-party culpability defense on the ground of inadmissibility, it is necessary to review the legal principles underlying such a defense: "The admissibility of evidence of [third–party] culpability is governed by the rules relating to relevancy. . . . Relevant evidence is evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence. . . . Accordingly . . . the proffered evidence [must] establish a direct connection to a third party, rather than raise merely a bare suspicion regarding a third party . . . . Such evidence is relevant, exculpatory evidence, rather than merely tenuous evidence of [third–party] culpability [introduced by a defendant] in an attempt to divert from himself the evidence of guilt. . . . In other words, evidence that establishes a direct connection between a third party and the charged offense is relevant to the central question before the jury, namely, whether a reasonable doubt exists as to whether the defendant committed the offense. Evidence that would raise only a bare suspicion that a third party, rather than the defendant, committed the charged offense would not be relevant to the jury's determination. A trial court's decision, therefore, that [third–party] culpability evidence proffered by the defendant is admissible, necessarily entails a determination that the proffered evidence is relevant to the jury's determination of whether a reasonable doubt exists as to the defendant's guilt." (Citations omitted; internal quotation marks omitted.) Id., 514–15.

"Whether a defendant has sufficiently established a direct connection between a third party and the crime with which the defendant has been charged is necessarily a fact intensive inquiry. In other cases, this court has found that proof of a third party's physical presence at a crime scene, combined with evidence indicating that the third party would have had the opportunity to commit the crime with which the defendant has been charged, can be a sufficiently direct connection for purposes of third party culpability. . . . Similarly, this court has found the direct connection threshold satisfied for purposes of [third–party] culpability when physical evidence links a third party to a crime scene and there is a lack of similar physical evidence linking the charged defendant to the scene. . . . Finally, this court has found that statements by a victim that implicate the purported third party, combined with a lack of physical evidence linking the defendant to the crime with which he or she has been charged, can sufficiently establish a direct connection for [third–party] culpability purposes." (Citations omitted.) *State* v. *Baltas*, 311 Conn. 786, 811–12, 91 A.3d 384 (2014).

"It is not ineffective assistance of counsel . . . to

decline to pursue a [third–party] culpability defense when there is insufficient evidence to support that defense. See *Dunkley* v. *Commissioner of Correction*, 73 Conn. App. 819, 827, 810 A.2d 281 (2002) (no evidence to support [third–party] claim, in part, because no one at scene implicated alleged third party), cert. denied, 262 Conn. 953, 818 A.2d 780 (2003); see also *Floyd* v. *Commissioner of Correction*, 99 Conn. App. 526, 531–32, 914 A.2d 1049 (insufficient evidence to substantiate [third–party] claim when predicated on alleged testimony of unlocated drug dealers who were also gang members), cert. denied, 282 Conn. 905, 920 A.2d 308 (2007); *Santiago* v. *Commissioner of Correction*, 87 Conn. App. 568, 591–92, 867 A.2d 70 ([third–party] statements did not contain sufficient substance to support viable [third–party] claim), cert. denied, 273 Conn. 930, 873 A.2d 997 (2005); *Alvarez* v. *Commissioner of Correction*, 79 Conn. App. 847, 851, 832 A.2d 102 (insufficient evidence to support [third–party] culpability defense when petitioner called only one witness at habeas hearing who did not even observe shooting), cert. denied, 266 Conn. 933, 837 A.2d 804 (2003); *Daniel* v. *Commissioner of Correction*, 57 Conn. App. 651, 684, 751 A.2d 398 (testimony not sufficient to raise [third–party] culpability defense because supporting witnesses' statements were inconsistent), cert. denied, 254 Conn. 918, 759 A.2d 1024 (2000)." *Bryant* v. *Commissioner of Correction*, supra, 290 Conn. 515–16.

In the present case, one of the reasons that defense counsel decided not to present a third-party culpability defense was that they did not believe that Holly's testimony was sufficient to establish a direct connection between Ford and the shooting but, rather, that it created only a mere suspicion that Ford may have accidentally shot the victim. According to defense counsel, there was no evidence that directly established that Ford shot the victim, either accidentally or otherwise, and none was introduced at the criminal trial.[20] In the absence of this nexus, defense counsel believed that Holly's testimony was irrelevant and, thus, inadmissible.

Defense counsel were correct that Holly's testimony would have failed to establish a sufficient nexus between the victim's murder and Ford. The third-party culpability evidence would have consisted of the following: (1) Ford had been the last person seen with the victim; (2) Ford had been in close proximity to the crime scene near the time of the shooting; and (3) Ford had been seen with a black semiautomatic pistol—manufacturer unknown, possibly fake—two to three days before the shooting.

Although Holly stated at the habeas trial that the gun he saw looked similar to the photograph he had been shown of a nine millimeter Hi-Point semiautomatic pistol, he never definitively testified that the gun he saw

was a nine millimeter Hi-Point semiautomatic pistol. He testified only that the gun he saw might have been a nine millimeter Hi-Point pistol on the basis of the fact that its ridges looked similar. He admitted, however, that he had seen other guns that have these kinds of ridges as well. There also was no evidence admitted at the habeas trial to establish that these ridges were a unique characteristic of a Hi-Point pistol. Thus, there was no clear evidence that Ford possessed the murder weapon.

Additionally, as far as defense counsel were aware,[21] there was no evidence that Ford had a gun in his possession at the time of the murder. There also was no evidence that anyone saw Ford shoot the victim or that Ford was present at the crime scene at the time of the shooting. Moreover, the record is devoid of any statements by Ford, the victim, or any other witness that would implicate Ford as the shooter.

As a result, the third-party culpability evidence at best created a mere suspicion of, but was too speculative to establish, a direct connection between Ford and the murder.[22] In the absence of this nexus, Holly's testimony was irrelevant and, thus, likely inadmissible.

Even if Holly's testimony did create some direct link between Ford and the murder, this nexus was sufficiently weak so as to justify defense counsel's strategic decision not to offer Holly's testimony on the ground that it would distract the jury from the weakness of the state's case and Ford's recantation. See, e.g., *Michael T.* v. *Commissioner of Correction*, supra, 319 Conn. 634 ("whether reasonable counsel could have concluded that the benefit of presenting [expert witness' testimony] . . . was outweighed by any damaging effect" that could occur, where testimony could have provided basis for admission of other evidence potentially harmful to petitioner); *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 681–82 (it is not deficient performance not to call witness if "counsel learns of the substance of the witness' testimony and determines that calling that witness is . . . potentially harmful to the case"). Holly's testimony would have required the jury essentially to conduct a trial within a trial to determine whether there was sufficient evidence that Ford had shot the victim so as to create reasonable doubt about the petitioner's guilt. As discussed previously, the evidence directly connecting Ford to the shooting was weak enough that it possibly would have served only to confuse or distract the jury by focusing the jury on the competing likelihood of whether Ford or the petitioner committed the murder. After all, the petitioner recently had assaulted and injured the victim and taken a bicycle from him. He expressed to Toles that he was concerned that he might be going back to jail over that incident. In an attempt to focus the jury on Ford's recantation and not to muddy the waters,

defense counsel made a reasonable strategic decision not to present a third-party culpability defense through Holly's testimony on the grounds that it was inadmissible and would distract from Ford's recantation. Accordingly, defense counsel did not perform deficiently by failing to present a third-party culpability defense. Therefore, the petitioner's claim fails under the first prong of *Strickland.*

2

Moreover, even if Holly's testimony were admissible, we also conclude that the petitioner failed to establish that Holly would have been unable to successfully invoke his fifth amendment privilege against self-incrimination. Without such evidence, the petitioner cannot establish prejudice under the second prong of *Strickland.*

Under the prejudice prong of *Strickland,* the petitioner was required to "demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Internal quotation marks omitted.) *Breton* v. *Commissioner of Correction,* supra, 325 Conn. 669. It is undisputed that if Holly had been called at the criminal trial, he would have attempted to invoke his fifth amendment privilege against self-incrimination.[23] As a result, to prove prejudice, the petitioner was required to establish that Holly's invocation of the privilege would have been rejected.

It is well settled that "[a] court may not deny a witness' invocation of the fifth amendment privilege against compelled self-incrimination unless it is *perfectly clear,* from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have [a] tendency to incriminate. . . . To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered *might* be dangerous because injurious disclosure could result." (Citations omitted; emphasis added; internal quotation marks omitted.) *Martin* v. *Flanagan,* 259 Conn. 487, 495, 789 A.2d 979 (2002); accord *In re Keijam T.,* 226 Conn. 497, 503–504, 628 A.2d 562 (1993).

"The privilege afforded not only extends to answers that would in themselves support a conviction under a . . . criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a . . . crime. . . . But this protection must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer. . . . To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a

responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. The trial judge in appraising the claim must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence." (Citations omitted; internal quotation marks omitted.) *Hoffman* v. *United States*, 341 U.S. 479, 486–87, 71 S. Ct. 814, 95 L. Ed. 1118 (1951).

In the present case, there was insufficient evidence to determine that Holly's invocation of his fifth amendment privilege would not have been sustained. Holly's testimony included an admission that he attempted to steal a gun, that he had previously possessed a similar gun, and that he "knew" guns. These statements must be viewed in light of Holly's pending armed robbery and assault charges, and the unrelated murder investigation. From this limited record, it appears that both the robbery charge and the murder investigation involved guns. It is unknown from this record what kinds of guns were at issue in those other matters. It is also unknown whether these other crimes occurred before or after the murder in this case. As a result, it is plausible that Holly's statement that he previously possessed a similar gun would implicate him in these other crimes. On this record, therefore, it is not "perfectly clear" that Holly would not have been entitled to invoke his fifth amendment privilege. In the absence of such clarity, the criminal trial court likely would have been precluded from denying Holly's invocation of his fifth amendment privilege against compelled self-incrimination.

The petitioner argues that this analysis focuses on the wrong question. He contends that the question is not whether Holly actually was entitled to invoke the privilege, but whether, on the basis of the information that would have been presented at the criminal trial, the trial court would have permitted Holly to invoke the privilege. The petitioner contends, on the basis of the evidence that would have been available at the time of the criminal trial, that there would not have been sufficient evidence to establish that Holly would be incriminated by his testimony such that the court would have rejected his invocation of the fifth amendment privilege.

The petitioner is correct that the question at issue is not whether Holly actually was entitled to invoke his fifth amendment privilege against self-incrimination. The petitioner, however, attempts to place too stringent of a burden on Holly to establish his right to remain silent at trial. For Holly to have invoked this privilege at the underlying criminal trial, he would not have had to prove that his testimony definitively would have incriminated him. To invoke the privilege, "it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer

to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." (Internal quotation marks omitted.) *Martin* v. *Flanagan*, supra, 259 Conn. 495. Thus, the question is: on the basis of the evidence provided, was there a possibility that Holly's testimony might be dangerous to him because injurious disclosure could result?

The testimony of Holly, Attorney Ullman, and Attorney Farver at the habeas trial established that there was indeed a possibility that Holly's testimony might result in an injurious disclosure.[24] Specifically, Holly's testimony involved his previous possession of guns. At the time of trial, Holly was charged with armed robbery involving a gun and was being investigated in connection with a murder that involved a gun. As a result, Holly's testimony that he recognized Ford's gun because it looked like a gun that he previously possessed had the possibility to "be dangerous because injurious disclosure could result." (Internal quotation marks omitted.) Id.

Because of this possibility of danger, a court could not reject Holly's invocation of the fifth amendment privilege because it would not be "perfectly clear" that he was not entitled to invoke the privilege. It was the petitioner's burden under *Strickland* to establish deficient performance by presenting sufficient evidence to show that it was perfectly clear that Holly was mistaken and that the trial court would have rejected his invocation. As discussed previously, the evidence presented at the habeas trial was insufficient to establish that it was "perfectly clear" that Holly was not entitled to invoke this privilege.

To overcome the shortcomings in the record, the petitioner emphasizes the fact that Holly testified that he did not believe that his testimony would incriminate him. The petitioner contends that, on the basis of this statement, Holly could not have invoked the privilege because a witness must have "reasonable cause to apprehend danger . . . ." *Hoffman* v. *United States*, supra, 341 U.S. 486.

It is true that a witness cannot invoke his fifth amendment privilege as a pretext to avoid answering questions. The standard, however, for determining whether a witness may invoke the privilege is not whether the witness correctly believes that his testimony would be self-incriminating but, rather, whether there is a possibility of incrimination. See *In re Keijam T.*, supra, 226 Conn. 504. As discussed previously, on the basis of the limited evidence in the record, there was such a possibility, and Holly's counsel had so advised him.

In the absence of the petitioner's having conclusively established that Holly could not invoke his fifth amendment privilege against self-incrimination and would have been required to testify, the petitioner cannot

establish that he was prejudiced by defense counsel's failure to present a third-party culpability defense through Holly's testimony. See *Smith* v. *Commissioner of Correction*, 141 Conn. App. 626, 634–35, 62 A.3d 554 (no prejudice when witness invoked fifth amendment privilege), cert. denied, 308 Conn. 947, 67 A.3d 290 (2013); *Robinson* v. *Warden*, Docket No. CV-04-0004561, 2009 WL 1333799, *4–5 (Conn. Super. April 21, 2009) (no prejudice where counsel believed witnesses might have invoked fifth amendment privilege), appeal dismissed sub nom. *Robinson* v. *Commissioner of Correction*, 129 Conn. App. 699, 21 A.3d 901, cert. denied, 302 Conn. 921, 28 A.3d 342 (2011); see also *Robinson* v. *Commissioner of Correction*, 129 Conn. App. 699, 704, 21 A.3d 901 (it was strategic decision by counsel not to call witness when counsel believed that witness might invoke fifth amendment privilege), cert. denied, 302 Conn. 921, 28 A.3d 342 (2011). Accordingly, the petitioner cannot establish his claim under the second prong of *Strickland*.

The judgment is affirmed.

In this opinion the other justices concurred.

[1] The jury reasonably could have found these facts regarding Ford's actions on the basis of his testimony from the petitioner's first trial, which culminated in a hung jury and a mistrial. At the second trial, Ford recanted and testified that he never saw the petitioner on the night of the shooting but felt pressured by the police to implicate the petitioner. Ford's testimony from the first trial was read into the record at the second trial pursuant to *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).

[2] At the habeas trial, Attorney Merkin testified that the theory of defense was that "there was not enough evidence in a single eyewitness [identification] case to convict [the petitioner] " and that the strategy for presenting this defense was "[t]o discredit . . . [Ford] as best we could and kind of make a claim that—with very weak credibility, that the jury shouldn't find that [the petitioner] was the person who committed this crime." As to Ford, specifically, part of defense counsel's theory, Merkin testified, "was that [Ford] wasn't in a location where he could see what he claimed to have seen. Part of it was that he was very coercively, in our view, interrogated . . . . And part of it was that we had some suspicion or belief that he was actually involved himself, whether accidentally or otherwise killing his friend."

[3] The petitioner has not challenged the habeas court's rejection of his conflict of interest claim on appeal.

[4] Attorney Merkin testified that she generally preferred not to present an alibi defense unless it was airtight: "My belief about alibis is that unless they are solid, they can get you into trouble. It's the last thing the jury hears if you have a good prosecutor who's a good cross-examiner and can try to kind of attack either a family member who's an alibi witness or some other vulnerability to the alibi. To me, it pulls attention away from the weaknesses in the state's case, and it kind of develops jurors' focus on the weaknesses in the alibi. So, it's just been my practice to shy away from alibis unless they're solid, and I had some concerns about the alibi in this case."

[5] Although Attorney Merkin testified that the petitioner's house was one block away from the crime scene and Attorney Jones testified that it was a few blocks away, the evidence offered at the criminal trial established that the petitioner's house was approximately two blocks from the crime scene.

[6] Detective Breland, who was in charge of the police investigation, testified at the habeas trial that Joyce did not provide him with information or give a sworn statement. Moreover, he testified that the petitioner did not tell him that Joyce had been home with him at the time of the murder. Rather, according to Detective Breland, the petitioner told him that he did not know who was home with him on the night of the murder.

[7] For example, Attorney Merkin testified that, initially, Joyce informed

the defense team that the petitioner left the house sometime between 11 p.m. and 12 a.m. but then in a later interview stated that he left sometime between 10:45 and 11 p.m.

[8] The only evidence presented at the petitioner's criminal trial regarding his whereabouts on the night of the murder was the testimony of Toles that the petitioner had called her at about 9:45 p.m. from his cell phone, stating that he was in the area and wanted to stop by her dormitory room at Southern Connecticut State University. She further testified that the petitioner did not immediately show up but that he arrived at her dormitory room at about 11 p.m. Southern Connecticut State University is approximately three miles from the crime scene. Although this evidence placed the petitioner a few miles from the crime scene after the murder, there was no evidence that placed him within two blocks of the crime scene at or near the time of the murder, as Joyce's testimony would have done.

[9] At the criminal trial, Joyner, who lived in the house outside of which the victim's body was found, testified that she heard a boom sound sometime between 10:25 and 10:30 p.m. Additionally, Baker, who lived in the neighborhood close to where the shooting occurred, testified at the criminal trial that he heard a person run past his window on the side of his house and into his backyard at about 10:15 p.m. and then heard a gunshot approximately five minutes later at about 10:20 p.m.

[10] The Appellate Court in *Spearman* held both that defense counsel's decision was reasonable trial strategy and that the petitioner was not prejudiced by defense counsel's decision. See *Spearman* v. *Commissioner of Correction*, supra, 164 Conn. App. 565.

[11] The petitioner argues that defense counsel's decision not to present an alibi defense cannot be strategic on the basis of counsel's not wanting to distract the jury from Ford's recantation because defense counsel did not know about the recantation prior to the start of evidence in the second trial. The petitioner argues that defense counsel are attempting to retroactively justify their actions. Attorney Merkin, however, testified that she made the final decision not to offer the alibi defense only after hearing Ford's recantation.

Moreover, the habeas court never determined that defense counsel's actions were not strategic; rather, it determined that defense counsel's strategy was unreasonable. As such, the issue is not whether defense counsel's decision not to present the alibi defense was strategic but whether it was a reasonable strategic decision.

[12] Joyce never testified that she was tasked with watching the petitioner or keeping account of his movements on the night of the shooting. Rather, she testified that the petitioner was not consistently within her line of sight during the time of the shooting and that she was watching her children and the television. If she had testified at the underlying criminal trial, the jury reasonably could have found that her focus had been on her children and the television.

[13] The petitioner contends that if defense counsel believes an alibi witness to be credible, it is deficient performance not to offer the witness' testimony at trial. This argument, however, ignores the fact that even if a witness is found to be highly credible by counsel or by the habeas court, it may be a reasonable strategic decision not to offer that witness' testimony if the witness would be vulnerable to attack on other grounds, or their testimony would raise other concerns or leave gaps in a defense. See *Michael T.* v. *Commissioner of Correction*, supra, 319 Conn. 637 ("in making a tactical decision whether to proffer [highly credible] expert testimony, reasonable counsel would have recognized that [the witness] would have been vulnerable to attack on various grounds"). Even though defense counsel found Joyce and Allen to be credible, defense counsel reasonably believed that the testimony of Joyce and Allen did not definitively account for the petitioner's whereabouts and instead created issues regarding the petitioner's proximity to the crime scene and consciousness of guilt. The credibility of Joyce and Allen did nothing to ameliorate defense counsel's concerns about these issues.

[14] Attorney Jones and Attorney Merkin testified that they disagreed about whether their concerns regarding the alibi defense outweighed the benefits of presenting the alibi defense. This case exemplifies the well established principle that because no two lawyers will try a case the same way, we must "affirmatively entertain the range of possible reasons [for counsel's decisions] . . . ." (Internal quotation marks omitted.) *Michael T.* v. *Commissioner of Correction*, supra, 319 Conn. 632. This disagreement between defense counsel also is further proof that they strategically and thoughtfully

considered the potential benefits and harm of presenting the alibi defense. Under the circumstances of this case, such consideration is not constitutionally deficient.

[15] To the extent that the petitioner argued before this court that defense counsel should have conducted additional investigation by obtaining phone records to solidify the timing of the telephone calls, he did not raise this argument in the habeas court and failed to present any evidence at his habeas trial to establish that the telephone records would have definitively proved that he was at home talking to Allen on the telephone via his landline at the precise time of the shooting. Not only did the petitioner fail to offer any telephone records that showed the timing of the telephone calls, but he failed to offer any evidence that established the precise time of the shooting. In the absence of such evidence, and in light of the proximity of the crime scene to the petitioner's house, the alibi defense leaves open the possibility that the petitioner could have left home unnoticed, committed the crime, and returned home unnoticed in a short span of time.

[16] Despite the petitioner's contention that the jury in his first trial would have found him not guilty if it had known his whereabouts at the time of the shooting, it is noteworthy that defense counsel spoke only with a single juror about her concerns, and that that juror reported that the jury was divided ten to two in favor of finding the petitioner guilty.

[17] The petitioner contends that because these issues are evidentiary in nature, the Appellate Court should have afforded deference to the habeas court's determinations and reviewed the issues under the abuse of discretion standard. We disagree.

Evidentiary rulings are afforded deference because a trial court has the inherent discretionary power to control the proceedings before it. See *Downs* v. *Trias*, 306 Conn. 81, 102, 49 A.3d 180 (2012) ("trial court possesses inherent discretionary powers to control proceedings, exclude evidence, and prevent occurrences that might unnecessarily prejudice the right of any party to a fair trial" [internal quotation marks omitted]). In the present case, the habeas court was not exercising its discretion to control the habeas trial. Rather, the habeas court was asked to determine a legal question—if Holly had been called at the underlying criminal trial, would the trial court have been compelled to admit his testimony or exercised *its* discretion to do so? As such, the habeas court was called on to review the hypothetical actions of another court regarding admissibility and privilege, not to make discretionary evidentiary rulings in a trial it was conducting. This court is equally capable of reviewing this legal question. Accordingly, our review is plenary.

[18] The petitioner also argues that the Appellate Court, acting sua sponte, improperly reached an issue that the parties did not brief: whether Holly's testimony was admissible as evidence of third-party culpability. We disagree. In the petitioner's brief before the Appellate Court, he specifically argued that defense counsel were deficient for failing to offer the testimony of Holly because it provided a sufficient factual nexus connecting Ford to the murder, which triggered the petitioner's right to present a third-party culpability defense. He argued that the habeas court properly determined that this nexus existed, making Holly's testimony relevant and, thus, admissible. Because the petitioner raised this issue before the Appellate Court as support for upholding the habeas court's decision, we reject the petitioner's argument that the Appellate Court improperly addressed this issue sua sponte.

[19] Defense counsel also testified at the habeas trial that they thought at the time of the second criminal trial that Ford had to admit to knowing Holly in order to create a foundation to present Holly's testimony. Defense counsel admitted at the habeas trial, however, that no such foundation was required.

[20] Attorney Merkin testified that people in the community did mention to Investigator Whalen that there was a rumor that Ford had accidentally shot the victim, but there were no witnesses who were able to testify that they heard Ford confess or saw Ford shoot the victim.

[21] Attorney Merkin, Attorney Jones, and Investigator Whalen consistently testified that Holly initially told them that he had seen Ford with a gun a few days before the murder. We are required to review defense counsel's performance on the basis of "counsel's perspective at the time," not on the basis of hindsight. *Strickland* v. *Washington*, supra, 466 U.S. 689. Defense counsel testified that on the basis of what Holly told them, they believed he had seen Ford with a gun two or three days before the shooting, not on the day of the shooting, as Holly later testified during the habeas trial. Additionally, even if Holly did see Ford with a gun on the day of the murder,

as he claimed at the habeas trial, no evidence established that Ford continued to have the gun in his possession later that night at the time of the murder.

[22] As further support for defense counsel's decision not to offer Holly's testimony because it was too speculative, it is noteworthy that in denying defense counsel's motion for a new trial, the trial court determined that defense counsel's argument that Holly's testimony provided a direct connection between Ford and the murder was "pure speculation." Following the jury's verdict in the second criminal trial, defense counsel filed a motion for a new trial on the ground that Holly's testimony should have been presented and was exculpatory. Because of Holly's intention to invoke his fifth amendment privilege against self-incrimination, the trial court accepted as true defense counsel's representation as to his proposed testimony for purposes of deciding the motion. Even after crediting Holly's testimony, the trial court determined that Holly's testimony would not produce a different result in a new trial because his testimony raised mere speculation, not a direct connection, that Ford committed the murder. The petitioner did not challenge this ruling on direct appeal. If he had done so, the issue would have been subject to the abuse of discretion standard of review because the judge who heard the motion for a new trial was the same judge who presided over the criminal trial. See *Jones* v. *State*, 328 Conn. 84, 104–105, 177 A.3d 534 (2018).

[23] Although there is a dispute as to whether Holly would have testified if the trial court had rejected his invocation of the fifth amendment privilege, there is no dispute that Holly would have attempted to invoke the privilege.

[24] The habeas court made no findings regarding the credibility of Attorney Ullman and Attorney Farver. It did, however, emphasize the fact that Attorney Farver was uncertain as to whether Holly would be able to invoke the fifth amendment privilege. The habeas court determined that Holly would have been required to testify because his pending charges were unrelated to the present case and there was no indication that his statement that he saw Ford with a gun would have exposed him to criminal liability in these other unrelated cases.

As the Appellate Court properly and succinctly stated: "[T]he [habeas] court took a [too] narrow view of the fifth amendment issue, considering only whether Holly's direct observations of Ford likely would have subjected him to criminal prosecution, rather than whether it was possible that any questions asked of Holly during his direct or cross-examination could possibly have incriminated him in any other criminal prosecution." (Emphasis omitted.) *Johnson* v. *Commissioner of Correction*, supra, 166 Conn. App. 126.